# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-50643

United States Court of Appeals
Fifth Circuit

**FILED**
September 26, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RICHARD MARTINEZ,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, GRAVES, and HIGGINSON, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

In this appeal, Richard Martinez challenges both his conviction and his sentence. Martinez asserts that the district court reversibly erred at trial by denying his motion to reopen the evidence to permit him to testify. With respect to sentencing, Martinez asserts that the district court attributed an erroneous quantity of methamphetamine to him when calculating his base offense level. Further, he contends the district court failed to adequately explain the basis for his sentence. We AFFIRM.

## BACKGROUND

Martinez was arrested on December 7, 2015, after a traffic stop in Austin, Texas. Officers stopped Martinez for an unsafe lane change, and they

No. 16-50643

soon discovered liquid methamphetamine hidden in the fuel tank of Martinez's truck.

## Trial and denial of motion to reopen

A federal grand jury returned a two-count indictment against Martinez. The indictment charged Martinez with (1) conspiracy to possess with intent to distribute 500 grams or more of methamphetamine (21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846) and (2) possession with intent to distribute 500 grams or more of methamphetamine (21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)).

Martinez entered a plea of not guilty, and the matter proceeded to a jury trial. The Government rested in the morning of the second day of trial, at which point Martinez unsuccessfully moved for acquittal pursuant to Fed. R. Cr. P. 29. Martinez then rested, and both the Government and defense closed their cases.

The court informed the jury that it would not hear any more evidence, and placed the jury into recess from 10:10 a.m. until 1:30 p.m. Outside the presence of the jury, counsel briefly discussed the jury charges. Around 10:15 a.m., the court placed itself in recess. When the court returned to the bench at 11:30 a.m., defense counsel immediately informed the court that Martinez wished to reopen the evidence and testify.

The court denied Martinez's oral motion to reopen. From start to finish, the colloquy between the court and counsel regarding the motion lasted only about ninety seconds.[1]

---

[1] The brief exchange unfolded as follows:

**DEFENSE:** My client had a discussion with me during the interlude, and has asked me to ask you to let him testify, but we would have to request to reopen. And I told him that was a matter within your discretion. My advice to him is my advice to him, but that's what his decision is at this point. I did ask him -- just for the record, I did ask him about that in great detail before we closed.

No. 16-50643

The jury ultimately convicted Martinez of possession with intent to distribute and acquitted him of conspiracy to distribute methamphetamine.

## **Sentencing**

Relying upon a law enforcement laboratory report concerning the substances recovered from Martinez's fuel tank, the PSR attributed 22.302 kilograms of methamphetamine (actual) and 879.317 grams of "ice" methamphetamine to Martinez. Under the 2015 U.S. Sentencing Guidelines Manual, this produced a base offense level of 38. No adjustments applied. Combined with Martinez's criminal history category of I, the PSR computed a guideline imprisonment range of 235 months to 293 months.

Martinez submitted a lengthy series of pro se objections to the PSR. The most pertinent, read broadly, contends that his truck's fuel tank could not hold the amount of liquid methamphetamine attributed to him. Specifically, Martinez asserted that, though he did not know "how to weigh or measure" the

---

**THE COURT:** I understand. I gave you plenty of time to do that.

**DEFENSE:** I know. I just wanted to put that on the record I did do that. Okay. So he did -- we did have that discussion prior to closing our case.

**THE COURT:** Can you state, for the record, that you are not advising him to testify?

**DEFENSE:** Well, I'll state, for the record, that I advised him of why it would not be a good idea to testify in full detail, but that it was his decision.

**THE COURT:** What says the government?

**GOVERNMENT:** You know, at this point, I'll object. I mean, this man's yanking the system around.

**THE COURT:** Well, I sustain. I'm not going to reopen the case. We've already told the jury that they're through. You've got the charges in your hand. And --

**GOVERNMENT:** Just for the record, my other reasons are, I had three rebuttal witnesses waiting in the hallway just in case he did that, and I've released them all and they're all back on duty somewhere in the county.

**THE COURT:** Well, no question that in my mind, it would not be beneficial for Mr. Martinez to testify.

drugs, there was "no way [he] had all that" methamphetamine because "that [amount] does not fit [in] a gas tank."

Defense counsel also moved for a downward variance "based on a policy disagreement with the present methamphetamine guideline." Counsel asked the court to consider the statutory minimum sentence of ten years.

At the sentencing hearing, the district court overruled Martinez's objections and imposed a 235-month prison sentence, which represented the bottom of the guidelines range. Near the end of the hearing, defense counsel stated that Martinez wished to appeal in part based on a claim of ineffective assistance of counsel. In connection with that possibility, the court indicated that it would permit defense counsel's withdrawal upon filing of the appropriate paperwork, and would then appoint new counsel if Martinez did not hire a lawyer. Defense counsel's last comment at the hearing was this remark: "He [i.e., Martinez's presumptive replacement counsel] would probably object to the reasonableness of the sentence. I will do that on your behalf."

## STANDARDS OF REVIEW
### Motion to reopen

"Generally, the reopening of a criminal case after the close of evidence lies within the sound discretion of the [district] court." *United States v. Walker*, 772 F.2d 1172, 1177 (5th Cir. 1985) (quoting *United States v. Ramirez*, 608 F.2d 1261, 1267 (9th Cir. 1979)). "The district court's decision whether or not to reopen the evidence will be overturned on appeal only upon a showing that it abused its discretion." *Id.* (citing *United States v. Thetford*, 676 F.2d 170, 182 (5th Cir. 1982), *cert. denied*, 459 U.S. 1148 (1983)).

"In *Thetford*, we outlined factors which the district court 'must' consider in exercising its discretion," which include "the timeliness of the motion, the character of the testimony, and the effect of the granting of the motion." *Id.*

(quoting *Thetford*, 676 F.2d at 182). "The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case-in-chief." *Id.* (quoting *Thetford*, 676 F.2d at 182). "The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused." *Id.* (quoting *Thetford*, 676 F.2d at 182). "The belated receipt of such testimony should not imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered." *Id.* (quoting *Thetford*, 676 F.2d at 182 (quoting *United States v. Larson*, 596 F.2d 759, 778 (8th Cir. 1979)).

### Procedural reasonableness of sentence

"This court reviews 'the district court's interpretation or application of the sentencing guidelines *de novo*, and its factual findings for clear error.'" *United States v. Groce*, 784 F.3d 291, 294 (5th Cir. 2015) (quoting *United States v. Scott*, 654 F.3d 552, 555 (5th Cir. 2011)). "We do not afford deference to the district court in the review of mathematical error in a sentencing guideline calculation." *United States v. Severin*, 221 F. App'x 299, 301 (5th Cir. 2006) (unpublished) (citing *Koon v. United States*, 518 U.S. 81, 98 (1996)).

### DISCUSSION

#### I. Motion to reopen

We review the district court's decision to deny the motion to reopen in light of the following four factors: (1) the timeliness of the motion; (2) the character of the testimony the movant wishes to present; (3) the effect of granting the motion; and (4) the reasonableness of the movant's excuse for failing to present the evidence in his case-in-chief. *See Walker*, 772 F.2d at 1177–84. As discussed below, we conclude that each of the first three factors favor, or do not weigh against, Martinez. However, Martinez's failure to provide the district court with a reasonable explanation for not exercising the

opportunity to testify before closing his case persuades us that the district court did not abuse its discretion by denying Martinez's motion.

## A. Timeliness of the motion

Martinez moved to reopen just under 1.5 hours after both parties rested and closed the evidence. This period of time is similar to or shorter than several other intervals after which this court has deemed motions timely. *See United States v. Parker*, 73 F.3d 48, 53–54 (5th Cir. 1996) (concluding that "a delay of one hour, during which the court took its normal lunch break" weighed in favor of the movant), *reh'g en banc granted and opinion vacated*, 80 F.3d 1042 (5th Cir. 1996), *and opinion reinstated in pertinent part on reh'g*, 104 F.3d 72 (5th Cir. 1997); *see also United States v. Rodriguez*, 43 F.3d 117, 125–26 (5th Cir. 1995) (concluding that a motion "was timely made" when the parties closed the evidence one evening, and the defendant moved to reopen the following morning, prior to closing argument). In *Walker*, we stated the delay between the close of evidence on a Friday and the defense's motion to reopen the following Monday "weigh[ed] against [the defendant's] position on appeal," but was "minor" and "not . . . such a significant factor as to govern the disposition." 772 F.2d at 1177–78.

Given the short time period between the closing of the evidence and Martinez's motion, and because Martinez moved to reopen before closing arguments and the jury charge, the timing of the motion weighs in Martinez's favor.

## B. Character of the testimony

In *Walker*, we deemed the defendant's "testimony in his own defense . . . of such inherent significance that the district court, as a matter of fairness, should have permitted him to testify." 772 F.2d at 1178–79. There, the defendant "had not testified at all," and we reasoned that "his testimony would be of particular interest to the fact finder because he would be testifying as the

alleged active participant in the activities which were the focus of the trial." *Id.* at 1179. "Where the very point of a trial is to determine whether an individual was involved in criminal activity," we stated, "the testimony of the individual himself must be considered of prime importance." *Id.; see also Parker*, 73 F.3d at 54 (holding that this factor weighed in favor of a defendant who wished to testify regarding "the one disputed fact in the trial" and who "was the only source of testimony available . . . to question [an] eyewitness account"). Testimony that would merely be cumulative of other evidence, however, may weigh against a motion to reopen. *See Rodriguez*, 43 F.3d at 126.

Martinez states that his defense turned on disavowing knowledge of the methamphetamine in his truck, and argues that "only [he] could have provided testimony" to rebut testimony law enforcement officers gave regarding the arrest. In response, the Government emphasizes the lack of any proffer and highlights defense counsel's statement to the district court that "it would not be a good idea [for Martinez] to testify in full detail." The Government also contends Martinez's testimony would not have been helpful because the Government could have marshalled additional impeachment evidence against his likely testimony.

The lack of a formal proffer is not fatal to Martinez's motion. In *Walker,* "no formal proffer of the content of [the defendant's] testimony was timely made. . . ." 772 F.2d at 1179. We cautioned that "in other circumstances this might count heavily against him," but under the circumstances presented in *Walker*, we "[did] not regard it as of any real significance." *Id.* The court described the relevant circumstances as follows:

> Neither the court below nor government counsel even obliquely raised any question in this regard, and indeed it was evident that the government would oppose, and the court would deny, the request to reopen regardless of any proffer concerning the

7

> content of Walker's proposed testimony. Moreover, it was obvious what Walker (who had not already testified) would testify about-namely, his version of his own conduct and statements as portrayed by the government's witnesses and asserted by the prosecution as constituting the offenses charged. These were matters that were, in the vast majority of instances, not covered by the testimony of any of the defense witnesses. It is and was unmistakable, undisputed, and obvious that Walker's testimony would have been highly relevant and significant and in no meaningful sense cumulative. Plainly, Walker's testimony had "exculpatory potential" and "would have enhanced appellant's defense." Apart from what appellant would have testified to, his presence on the stand would have afforded him the opportunity to have the jury observe his demeanor and judge his veracity firsthand.

*Id.* (quoting *Larson*, 596 F.2d at 779).

Several of these circumstances are similar to Martinez's case. Neither the court nor the Government pressed defense counsel for a proffer. It was obvious that Martinez would have told "his version" of events. The potential for cumulative testimony was low, as Martinez would have become the only defense witness. Though defense counsel believed Martinez's desire to testify "would not be a good idea," and the Government might have impeached Martinez's testimony, Martinez's presence on the stand "would have afforded him the opportunity to have the jury observe his demeanor and judge his veracity firsthand." *See id.*

We conclude that the character of Martinez's likely testimony weighs in favor of his motion.

### C. Effect of granting the motion

"The belated receipt of [the defendant's] testimony should not 'imbue the evidence with distorted importance, prejudice the opposing party's case, or

preclude an adversary from having an adequate opportunity to meet the additional evidence offered.'" *Walker*, 772 F.2d at 1177 (quoting *Thetford*, 676 F.2d at 182 (quoting *Larson*, 596 F.2d at 778)). As in *Walker*, Martinez's motion to reopen came before the jury had been charged and before closing arguments commenced, *see* 772 F.2d at 1179, so the flow of trial would not have been significantly altered by permitting Martinez to testify.

The Government observes that in this case, the Government had already released its rebuttal law enforcement witnesses "back on [to] duty somewhere in the county." This is a distinction from *Walker*, where "there [was] no suggestion in the record . . . that the government let any potential rebuttal witnesses go." *Id.* at 1180. But as Martinez notes, the witnesses had only recently been released when Martinez moved to reopen. The Government offers no concrete explanation of the prejudice associated with recalling them, outside of stating that "the officers would not have been expecting to be called back, which might have made reaching them difficult."

The Government also argues Martinez's testimony could have confused jurors and might have required delays for the preparation of new jury instructions. The district court could have mitigated the risk of jury confusion through a cautionary instruction. *See Parker*, 73 F.3d at 54 ("It is clear to us that, with proper cautionary instruction, the jury could have adequately weighed the additional testimony."). Moreover, shortly before Martinez moved to reopen, the Government indicated that it had already prepared a jury instruction for use in the event Martinez testified.

Under these circumstances, the likely effects of granting Martinez's motion do not weigh against him.

No. 16-50643

D. Reasonableness of Martinez's excuse

Martinez offered the district court no specific justification for his belated decision to testify. In fact, defense counsel stated that he asked "in great detail before . . . clos[ing]" about Martinez's desire to testify.

On appeal, Martinez argues that "he was in an unfamiliar setting," was in "an agitated and emotional state," and "had very little time to make one of the most important decisions in his life." The Government criticizes Martinez for failing to articulate these excuses below.

While *Walker* says the district court "must" consider the first three factors discussed above, it does not use the same mandatory language with respect to the movant's excuse. *See* 772 F.2d at 1177 ("The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case-in-chief.") (quoting *Thetford*, 676 F.2d at 182). Accordingly, Martinez's failure to provide a specific excuse below is not inherently fatal to his appeal.

That failure did, however, bring the district court's decision to deny Martinez's motion within the proper scope of its discretion. The court heard no excuse, and was instead informed that defense counsel spoke in detail with Martinez about testifying before closing the defense's case. Although we conclude the first three factors weigh in Martinez's favor, or are neutral to him, this factor weighs against Martinez and provides a sufficient basis for the district court's discretionary ruling.

## II.  Methamphetamine quantity

The PSR attributed to Martinez 22.302 kilograms of methamphetamine (actual) and 879.317 grams of "ice" methamphetamine. Martinez challenges both figures.

No. 16-50643

A. <u>Methamphetamine (actual)</u>

Martinez contends that the PSR's calculation of the amount of methamphetamine (actual) at issue lacks an adequate evidentiary basis. He focuses on the data presented in the laboratory report the PSR referenced. The laboratory report set forth the results of testing performed on several buckets of liquid pumped out of Martinez's fuel tank. Martinez maintains that the report lacks two essential data points: (1) the volume of the methamphetamine-containing liquid in each bucket; and (2) the weight of methamphetamine hydrochloride (i.e., the type of methamphetamine the report identified in the buckets) per unit of volume.

Martinez notes that the only unit of measurement provided in this report is a unit of mass/weight (here, kilograms). He highlights testimony from the report's author, who stated that she quantified the "concentration" of methamphetamine in each bucket and observed small variations in the concentration between buckets. "Concentration" refers to the measure of a substance present in a given unit of volume of a solution or mixture. *See Concentration*, OXFORD ENGLISH DICTIONARY (3d ed. 2015) (definition 5.b).

The PSR's attribution of 22.302 kilograms of methamphetamine (actual) to Martinez matches the quantity one would calculate from the laboratory report by multiplying each liquid-containing bucket's "net weight" by the indicated percentage of methamphetamine hydrochloride. The 2015 Sentencing Guidelines, which applied to Martinez's sentence, specifically offered a similar weight-based example, stating: "[A] mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual)." U.S.S.G. § 2D1.1(c), cmt. n.(B) (2015 ed.). The Government submits that the sentencing court's adherence to the weight-based example in the guidelines cannot constitute reversible error.

11

Martinez's "concentration" argument was not clearly presented below. Martinez relies on statements from his pro se objections, but those objections did not bring the specific calculation error Martinez now alleges into adequate focus.[2] Plain error review therefore applies. We hold that any error in the district court's calculation would not have been "clear or obvious," particularly in light of the 2015 Sentencing Guidelines' example calculation, and therefore could not have constituted reversible plain error.[3]

### B. "Ice" methamphetamine

Similarly, Martinez argues that the record does not contain the data necessary to compute the quantity of "ice" methamphetamine seized. The laboratory report relied upon by the PSR identified two quantities of a "white crystalline substance" as d-methamphetamine hydrochloride. The reported "net weight" of these two samples would total approximately 927 grams. To arrive at the approximately 879 grams of "ice" methamphetamine attributed to Martinez, the PSR apparently multiplied each sample's "net weight" by the indicated percentage of "hydrochloride salt."

Martinez argues that the record lacks evidence "as to the purity or nature of the hydrochloride salt," and contends the PSR lacked any basis for concluding the hydrochloride salt consisted of at least 80% d-methamphetamine hydrochloride. *See* U.S.S.G. § 2D1.1(c), Notes to Drug

---

[2] By way of example, one of Martinez's pro se writings stated: "I object[,] no way I had all that . . . your [sic] adding ghost dope . . . I'm not good at math[,] but I've been told all that does not fit [in] a gas tank . . . I don't know how to weigh or measure this but it sounds impossible." Statements of this sort were not sufficiently specific to notify the district court of the nuanced argument Martinez asserts on appeal.

[3] Martinez also argues the district court erred by failing to determine how much of the methamphetamine-containing mixture was "usable." We disagree. The PSR relied upon the calculation of the actual amount of methamphetamine in each bucket of liquid, not the weight of the mixtures.

Quantity Table (C) (2015 ed.) ("'Ice,' for the purposes of this guideline, means a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity."). Again, Martinez did not clearly raise his current arguments below and we review only for plain error.

We hold that the district court did not clearly or obviously err by reading the percentage notations in the lab report as purity levels. Additionally, even if the "ice" methamphetamine calculation amounted to plain error, that error would be harmless. The district court's calculation of methamphetamine (actual), which we affirm for the reasons previously stated, provides an independent basis under which Martinez's base offense level would remain at 38. *See* U.S.S.G. § 2D1.1(c), drug quantity table (2015 ed.) (prescribing a base offense level of 38 for "45 KG or more of Methamphetamine, or 4.5 KG or more of Methamphetamine (actual), or 4.5 KG or more of 'Ice'").

### III.    Explanation of Martinez's sentence

Martinez contends the district court erred by sentencing him without an adequate explanation. We find no reversible error.

In this case, the court selected a sentence at the bottom of the guidelines range. "[W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation." *Rita v. United States*, 551 U.S. 338, 357 (2007). "The sentencing judge should," however, "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Id.* at 356.

The parties dispute the applicable standard of review. Martinez contends his counsel's general objection "to the reasonableness of the sentence" preserved his current argument for abuse of discretion review. The Government contends plain error review applies. *United States v. Mondragon-Santiago* resolves this dispute in favor of plain error review. *See* 564 F.3d 357,

361 (5th Cir. 2009) (applying plain error review after concluding that an objection generally arguing that a sentence was "greater than necessary" would not put the district court on notice "that the defendant wanted further explanation of the sentence").

To prevail on plain error review, Martinez must show that the alleged error affected his substantial rights. *See id.* at 361. "To show that an error affects a defendant's substantial rights, the defendant must show that it affected the outcome in the district court . . . ." *Id.* at 364. Martinez argues that his substantial rights were affected because the exercise of rendering an adequate explanation may have prompted the court to consider a different sentence, and might have refocused the district court on the question of whether safety valve relief was available.

"We afford great deference to sentences within the Guidelines range, and we 'infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines in light of the sentencing considerations set out in § 3553(a).'" *Id.* at 365 (quoting *United States v. Campos-Maldonado*, 531 F.3d 337, 338 (5th Cir. 2008)). "While a district court errs by failing to explain a sentence, the effect of that error on our review for reasonableness is diminished when the sentence is within the Guidelines range." *Id.*

Martinez's speculation that the district court might have reconsidered his sentence in the course of providing a fuller explanation is too uncertain to carry his burden of demonstrating the alleged error affected the result below. Therefore, even if the district court erred by giving an inadequate explanation (an issue we need not decide), that error would not be reversible on plain error review.

## CONCLUSION

For the reasons set forth above, we AFFIRM Martinez's conviction and sentence.