# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30737

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

KENDRICK D. ALEXANDER,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

March 15, 2017

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:14-CR-126-1

Before PRADO, HIGGINSON, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:*

While gambling at a Baton Rouge casino in June 2014, Kendrick Alexander met Hai Tran. Unknown to Alexander, Tran was a DEA cooperator. By August, Alexander was seeking to purchase oxycodone from Tran's fictional source of supply—a much riskier gamble, it turned out, than any offered by the casino. A jury convicted Alexander of attempted possession with intent to distribute oxycodone. At trial, Alexander admitted that he made that attempt,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-30737

but argued Tran implanted his intent to commit the crime. Alexander claims the jury acted unreasonably when it rejected this entrapment defense. He also maintains the district court gave a flawed jury charge, should have granted him a new trial because of a *Brady/Giglio* violation, and incorrectly determined his sentence. Finding no reversible error, we affirm.

## I.

In early August, Tran began to record his conversations with Alexander. On the first recorded call, Tran asked Alexander if he remembered asking about the "RZ," a street name for oxycodone tablets. Alexander said yes. In recorded conversations over the next several days, Alexander and Tran negotiated a price of $60,000 for 5,000 30-mg tablets, a deal Alexander expected to make about once per week going forward.

Alexander and Tran planned to complete the oxycodone deal on August 14, and Alexander said he would "have [his] people lined up." Alexander mentioned that he was making arrangements with partners and clients. He also asked Tran about purchasing marijuana, cocaine, and codeine syrup, which he referred to as "grapes," "the white," and "the syrup." At a recorded meeting, Alexander said he was ready to complete the deal and brought his money early. Two days later, as planned, Alexander and Tran met in a parking lot and Alexander showed Tran a paper bag containing $60,000. They headed to another location where Alexander was to purchase the oxycodone. Alexander was arrested on the way and the money was seized.

At trial, Tran and Alexander gave conflicting accounts of their interactions before Tran's recording of their conversations. Tran testified that Alexander was the first to bring up illegal drugs, asking Tran whether he could get "roxies," another street name for oxycodone tablets. Tran maintained he immediately contacted his handler, DEA Agent Chris Abney, about that conversation and followed instructions to record future interactions.

2

No. 16-30737

Alexander, on the other hand, claimed that shortly after they met, Tran brought up controlled substances.  He asked Alexander if he knew anyone "that mess with the green," meaning marijuana, and brought up illegal drugs with Alexander on four to five occasions, once stating that his supplier could get "any drug [Alexander] want[ed]."  Alexander asserted that on August 5, before the first recorded call, Tran asked him to meet at the casino and offered to get him oxycodone tablets—"the hottest thing on the streets"—"for real cheap." Tran allegedly offered to get him the tablets for $14 or $15 per tablet, a bargain, as Tran said they sold on the street for $25 to $30.  Alexander said Tran offered to introduce him to people who could help him sell the tablets. Alexander testified that, at the time, he did not know what oxycodone was, but he agreed to make the purchase and negotiated the price down to a bulk rate of $12 per tablet for 5,000 tablets.

Alexander testified that this was his first drug deal in close to ten years, a statement the government did not dispute.  Alexander had been convicted once before, in 2001, for possession with intent to distribute cocaine.  The government introduced that conviction into evidence without objection.

The jury also heard about Tran's extensive history of convictions and lying.  Tran testified that: he was convicted in 1993 for accessory after the fact to second degree murder; he was convicted in 2001 for drug trafficking; he was arrested in 2006 for transporting drugs while out of the state in violation of the conditions of his supervised release; he lied to his probation officer and state authorities about that arrest, claiming the drugs were not his, and thus "defrauded the state of Florida into dismissing the charges"; he continued trafficking while on supervised release; in 2008 he was indicted for federal drug trafficking, a fugitive for about six months, then arrested and pleaded guilty; and he submitted a false affidavit in 2008 claiming he had no assets in order

to obtain a court-appointed attorney while hiding several hundred thousand dollars in drug proceeds.

Tran began cooperating with the government following his 2008 arrest. He received a substantial sentence reduction based on that cooperation: facing a Sentencing Guidelines range of 210 to 262 months, he ended up with a sentence of 48 months after the government sought a considerable reduction. After Tran's release from prison, he continued working as an informant for the DEA, regularly checking in with Abney. He testified at Alexander's trial that he hoped his continued cooperation would lead to a reduction of his brother's fourteen-year federal sentence for drug crimes.

Despite this strong impeachment evidence of Tran, the jury found Alexander guilty. That verdict included rejection of an entrapment defense, on which the court had instructed the jury over the government's objection.

Alexander later moved for a new trial on *Brady*/*Giglio* grounds. During trial, defense counsel had sought permission to question Tran about an information filed against him in Ascension Parish in 2007 for conduct related to that underlying his 2008 federal conviction. The government had represented it was not aware of any pending charges. The court allowed counsel to examine Tran outside the presence of the jury, and Tran said he had "no idea" what happened with the Ascension Parish case but had no expectation that it would be dismissed based on his cooperation in Alexander's prosecution. Relying in part on the government's representations, the district court did not allow defense counsel to question Tran about the state charge.

After trial, Alexander's counsel continued investigating this matter and discovered that Abney, who was in court when the parties were disputing the significance of the Ascension Parish charge, assisted in the search that led to the state court charges. Alexander also obtained a 2009 letter from a state detective to the assistant district attorney handling Tran's case. The letter

stated that Tran had been charged federally and was cooperating; thus it requested that charges against Tran's wife, who had also been charged, be dismissed. They were, in 2009.

Alexander argued this amounted to *Giglio* violations because the government concealed two things about which the defense could have impeached Tran for bias: (1) state charges remained pending against Tran, and (2) charges against Tran's wife had been dismissed as a result of Tran's prior cooperation. The government came forward with an explanation of what happened to Tran's state court charges: according to an assistant district attorney, the same state detective who requested that Tran's wife's charges be dismissed also asked the office not to take further action on Tran's case and, as a result of inactivity, the state case prescribed in 2011. The record remains unclear as to whether the state court charges were subsumed in the 2008 federal prosecution of Tran. Although the state apparently did not pursue charges because of the federal prosecution, the state court charges were not officially dismissed until after Alexander's trial. After considering this new evidence, the district court denied Alexander's motion for a new trial. It concluded the evidence was not material on the grounds that (1) it was cumulative given the extensive challenges the jury heard to Tran's credibility, and (2) the strong corroboration the recordings provided of Tran's testimony.

At sentencing, the district court calculated Alexander's Sentencing Guidelines range as 121 to 151 months. Alexander objected to a two level obstruction of justice enhancement and argued that he should receive a reduction for acceptance of responsibility. He also requested a downward departure because the government set a price for the oxycodone below market value, which meant the deal involved a greater drug quantity, which in turn increased his Guidelines range. The district court overruled the objections,

No. 16-30737

denied the motion for downward departure, and sentenced Alexander to 121 months in prison.

## II.

## A.

Alexander claims the evidence at trial was insufficient to show that he was not entrapped. The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with government agents. *United States v. Theagene*, 565 F.3d 911, 918 (5th Cir. 2009). The government may not "implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States,* 503 U.S. 540, 548 (1992). A valid entrapment defense has two related elements: government inducement and a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Mathews v. United States*, 485 U.S. 58, 63 (1988). Entrapment operates through a burden shifting regime. *Theagene*, 565 F.3d at 918. Before a court will instruct the jury on entrapment, the defendant must make a prima facie showing of both elements. *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997). A defendant who makes this showing is entitled to an instruction; the burden then shifts to the government to prove beyond a reasonable doubt that the defendant was not entrapped. *Id.* at 521–22.

We typically see entrapment raised on appeal when the trial court refused to instruct the jury on the defense. *See, e.g., Theagene*, 565 F.3d at 917–18. Because that instruction was given here, and the jury rejected the defense, Alexander faces a heavier burden than a defendant alleging error in a failure to instruct on entrapment. He must show the jury irrationally concluded he was not entrapped. *United States v. Rodriguez*, 43 F.3d 117, 126 (5th Cir. 1995). His challenge is even greater because, although sufficiency of the evidence is typically reviewed *de novo*, "a defendant must specify at trial

No. 16-30737

the particular basis on which acquittal is sought so that the Government and district court are provided notice." *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007). Alexander moved for acquittal but did not argue he was entrapped as a matter of law, instead asserting entrapment turned on a credibility determination within the province of the jury. We thus review only for whether the evidence supporting the jury's verdict "was so tenuous that a conviction would be shocking." *See United States v. Batiste*, 275 F.3d 45, 45 (5th Cir. 2001) (per curiam) (quoting *United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir. 1992)).

The jury was entitled to reject the entrapment defense if it found either that Alexander was not induced or that he was predisposed (of course, if there was no inducement, he was necessarily predisposed). *United States v. Wise*, 221 F.3d 140, 154 (5th Cir. 2000). The evidence is sufficient to support both findings.

First, a reasonable jury could find Alexander was predisposed to commit the crime. Predisposition focuses on "whether the defendant was an 'unwary innocent' or instead an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Id.* (quoting *United States v. Brace*, 145 F.3d 247, 254 (5th Cir. 1998)); *Bradfield,* 113 F.3d at 522. Alexander's "active, enthusiastic participation" after being approached by Tran is sufficient to allow a jury to find predisposition. *See Rodriguez*, 43 F.3d at 126–27; *Wise*, 221 F.3d at 154. Once Alexander agreed to purchase oxycodone, he negotiated a low purchase price, agreed to purchase 5,000 tablets per week, and began making arrangements with dealers to sell the tablets. He also asked Tran about purchasing cocaine, marijuana, and codeine syrup. This participation was more active and enthusiastic than that we have found sufficient to prove predisposition in other cases. *Theagene*, 565 F.3d at 917, 919 (after agreeing

7

to bribe an IRS official, continuing to pay the agreed upon cash amounts was sufficient); *see also Rodriguez*, 43 F.3d at 120, 127.

"Other factors that may tend to prove predisposition include desire for profit; demonstrated knowledge or experience with the criminal activity under investigation; the character of the defendant, including past criminal history; whether the government first suggested criminal activity; and the nature of the inducement offered by the government." *United States v. Reyes*, 239 F.3d 722, 739 (5th Cir. 2001). A rational jury could conclude that Alexander was motivated by profit. He negotiated a low price for a bulk order of the tablets, and there is no other apparent motive. He demonstrated knowledge of drug trafficking by contacting partners and dealers to distribute the tablets and using slang terms for controlled substances in recorded conversations. *See id.* at 740.

Tran and Alexander accuse each other of initiating the criminal activity. The jury was entitled to credit Tran's testimony and reject Alexander's. *See United States v. Mora*, 994 F.2d 1129, 1137 (5th Cir. 1993) (explaining that even when a defendant's testimony of entrapment is uncontradicted, it "cannot by itself establish entrapment as a matter of law because, absent unusual circumstances, the jury is almost always entitled to disbelieve that testimony"). In any case, who initiated the criminal activity is just one factor in the analysis. *See United States v. Gilmore*, 590 F. App'x 390, 397–99 (5th Cir. 2014) (per curiam).

Alexander argues the government improperly relied on his prior conviction to prove predisposition. It is true that Alexander's 2001 conviction alone would not have supported his conviction. The Supreme Court has held "a nine-year-old sales conviction and a five-year-old possession conviction are insufficient to prove [a] petitioner had a readiness to sell narcotics" in the absence of other evidence. *Sherman v. United States*, 356 U.S. 369, 375 (1958).

But here, unlike in *Sherman*, the government presented the additional evidence of predisposition discussed above. That is consistent with our caselaw recognizing criminal history may be considered with other factors in establishing predisposition. *Reyes*, 239 F.3d at 739.

Second, a reasonable jury could have concluded that the government's involvement did not rise to the level of inducement, or "creative activity of law enforcement officials in spurring an individual to crime." *United States v. Gutierrez*, 343 F.3d 415, 420 (5th Cir. 2003) (quoting *Bradfield,* 113 F.3d at 522). To be inducement, government involvement must be "more substantial than simply providing an opportunity or facilities to commit the offense." *Bradfield,* 113 F.3d at 521. Merely conducting undercover operations or otherwise employing "artifice and stratagem" is not inducement. *Theagene*, 565 F.3d at 922 (quoting *United States v. Ogle*, 328 F.3d 182, 185 (5th Cir. 2003)). Courts instead have found inducement when government agents harass or threaten a defendant, take "actions designed specifically to take advantage of the defendant's weaknesses," or "persist in encouraging criminality after a defendant rejects overtures." *Id.* (quoting *Gutierrez,* 343 F.3d at 420); *Gilmore*, 590 F. App'x at 397–98.

There was more than sufficient evidence for the government to disprove inducement. If the jury believed Tran's testimony, which it was entitled to do, then Alexander independently initiated the drug deal and the government did no more than "provid[e] an opportunity or facilities to commit the offense."

*Bradfield,* 113 F.3d at 521.[1]    But even if the jury believed Alexander's testimony that Tran offered him the opportunity to buy drugs on up to five occasions before he finally accepted the invitation, the jury would be entitled to conclude that the government's involvement did not rise to the level of inducement.    There was much less government involvement here than in *Sherman*, in which the evidence established entrapment as a matter of law. There, an informant met the defendant when they were both being treated for narcotics addiction and, after numerous intimate conversations about personal experiences with narcotics, the informant repeatedly begged the defendant for illegal drugs, claiming treatment was not working for him and he was suffering.  356 U.S. at 373.  Because the uncontroverted evidence established the informant preyed on the defendant's weakness and appealed to his empathy, inducement was established as a matter of law.  *Id.*  Government involvement here is also significantly less than in *Jacobson*, the only other case Alexander points to in which entrapment was established as a matter of law; there, uncontested evidence showed two and a half years of "repeated efforts by two Government agencies, through five fictitious organizations and a bogus pen pal, to explore petitioner's willingness to break [a] new law" before the defendant acquiesced.  503 U.S. at 543.

*Sherman* and *Jacobson* are unusual cases in removing the entrapment question from the jury's purview.  *Contrast United States v. Nations*, 764 F.2d 1073, 1077 (5th Cir. 1985).  In a case similar to this one, we held that the

---

[1] Alexander argues this is contrary to Abney's grand jury testimony.  Abney testified that Alexander attempted to purchase oxycodone from Tran *after* Tran "told him that he had a source in California that could provide pretty much anything."  Abney also said, however, "Alexander approached [Tran] in reference to purchasing narcotics," and "Alexander had approached [Tran] about purchasing roxies."  Abney did not testify that Tran initiated the oxycodone deal.  Even if he had, however, the jury would be entitled to credit Tran's testimony that Alexander initiated conversations regarding controlled substances.

question of entrapment was for the jury because "[t]here was not overwhelming evidence of serious resistance" by the defendant, only contested evidence about a handful of meetings initiated by the government agent. *Id.*; *see also Gilmore*, 590 F. App'x at 399 (holding that although informant initiated conversation about illegal campaign contributions, thus doing more than "passively providing a platform for bribery," evidence of inducement was not sufficient to warrant an entrapment instruction). That is consistent with our observation that the "question of entrapment is generally one for the jury, rather than for the court." *Mathews,* 485 U.S. at 63. The jury's finding that Alexander was not entrapped was well within its discretion.

## B.

Alexander next asserts that the district court erred in telling the jury that "in determining whether the Defendant lacked predisposition to commit this crime and was induced to commit the crime, you may consider the Defendant's prior conviction for possession with intent to distribute a controlled substance in 2001." Alexander alleges the instruction runs afoul of *Sherman* because the Supreme Court held that a jury could not find predisposition from evidence of two prior convictions. 356 U.S. at 375. Yet as noted, we have held that convictions are a factor that tend to prove disposition. *Reyes*, 239 F.3d at 739.

Even assuming that the instruction should not have been given, it was harmless. An erroneous instruction is not a ground for reversal if, "in light of the entire record, the challenged instruction could not have affected the outcome of the case." *United States v. Montgomery*, 747 F.3d 303, 308–09 (5th Cir. 2014) (citations omitted). The evidence was overwhelming that Alexander was predisposed and not induced to commit the crime. Recordings indicate that Alexander asked Tran about oxycodone, not the reverse, and show that Alexander was an active and enthusiastic participant, motivated by profit,

No. 16-30737

with ready connections to drug dealers, and familiar with and interested in purchasing a number of illegal substances. They show no resistance on Alexander's part and no threats, coercion, or appeals to sympathy on Tran's part. Considering the entire record, we are convinced the instruction did not affect the outcome of the case.

### C.

Alexander next argues that he is entitled to a new trial based on *Giglio* violations. We review *de novo* the denial of a motion for new trial sought on *Brady* or *Giglio* grounds, but "with deference to the factual findings underlying the district court's decision." *United States v. Severns,* 559 F.3d 274, 278 (5th Cir. 2009).

*Giglio* applies *Brady*'s disclosure requirement to "evidence affecting the credibility of key government witnesses." *United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010). *Giglio* violations often arise in the context of the benefits cooperating witnesses expect to receive for testifying. *Id.* The district court concluded that the additional impeachment evidence Alexander identified after trial was not material. Evidence is material in this context when there is "'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (quoting *Giglio v. United States,* 405 U.S. 150, 154 (1972)). The new evidence must undermine confidence in the verdict. *Id.*

Alexander argues the evidence about Tran's pending state charge from 2007 and the dismissal of his wife's charge is material because it shows Tran's bias toward the government and the incentive for his cooperation. We agree with the district court, however, that for two reasons the nondisclosures were not material. First, the evidence was cumulative. "[E]vidence which impeaches an already impeached witness is by definition cumulative." *United States v. Sipe*, 388 F.3d 471, 489 (5th Cir. 2004). It thus will often not be

12

material. *Id.* As to be expected given the highly factbound nature of the materiality inquiry, this not a hard-and-fast rule. Cumulative impeachment evidence can be material when it "changes the tenor" of the witness's testimony. *Id.* For example, in *Sipe*, although the government disclosed that witnesses received immigration benefits based on their cooperation, evidence of additional benefits—which showed the "disturbing" scope of the government's control over them—was material when viewed cumulatively with other suppressed evidence. *Id.* Further, evidence of dishonesty "does not render cumulative evidence that the prosecution promised immunity for testimony." *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977). We have thus found material evidence showing a key witness falsely testified that he had not been promised a future benefit. *Id.*; *see also Giglio*, 405 U.S. at 155.

The district court chronicled thirteen instances in which Tran's credibility was impeached at trial. Those provided powerful reasons to doubt his veracity based on numerous past convictions, a long history of lying to the government, his receipt of a significant benefit for providing assistance in a prior case, and his hope to receive a future benefit based on his testimony in Alexander's trial. The suppressed evidence is similar to Tran's extensive impeachment baggage revealed at trial and thus does not change the tenor of the testimony as it did in *Sipe*. Nor does it show that Tran had an undisclosed understanding or agreement with the government for a benefit in the Ascension Parish case in exchange for his testimony like the witness in *Sanfilippo*. Further, unlike in *Sanfilippo*, the suppressed evidence does not provide the only forward-looking motive for Tran to lie. Tran admitted that he hoped to gain something by testifying: a sentence reduction for his brother. Similarly, the suppressed evidence about Tran's wife's charges was not the only evidence of benefits Tran received for past cooperation. The jury heard that

his sentence had been reduced by about thirteen years.  There is no reasonable likelihood that the jury's learning that Tran's wife's charges were dismissed based on the same past cooperation would have changed its thinking.

Second, Tran's testimony was not the only evidence at odds with entrapment.  When "the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material."  *Sipe*, 388 F.3d at 478.  As discussed above, the recordings introduced at trial are strong evidence of predisposition; they show that, from August 5, 2014, onward, Alexander was active, enthusiastic, and knowledgeable participant in the crime.

Of course, Tran's testimony is the only evidence contradicting Alexander's claims about what happened before August 5.  If the jury relied on Tran's testimony about that time, additional reasons to discredit him could have changed its calculus on inducement.  *Reyes*, 239 F.3d at 739.  From the evidence discussed above, however, there is no reasonable probability the jury would not have found Alexander predisposed to commit the crime even if it credited his testimony about inducement.  Given the quantity and quality of reasons the jury had not to take Tran at his word even without the undisclosed evidence, and the strength of other evidence of Alexander's predisposition, the undisclosed evidence does not cast sufficient doubt on the verdict to merit a new trial.  *See Davis*, 609 F.3d at 696–97.

## III.

We can more readily resolve Alexander's challenges to his sentence.  Whether a defendant's Guidelines range should be lowered for acceptance of responsibility or increased for obstruction of justice are factbound inquiries to which we owe the district court deference.  *United States v. Smith*, 804 F.3d 724, 737 (5th Cir. 2015); *Brace*, 145 F.3d at 264.

14

No. 16-30737

The district court did not err in denying a reduction for acceptance of personal responsibility. We have previously rejected Alexander's position that a defendant who admits engaging in the alleged conduct, but argues entrapment, has accepted responsibility. *Brace*, 145 F.3d at 265. Because an entrapment defense denies the *mens rea* element, it is the "denial of factual guilt" that makes a defendant ineligible for an acceptance-of-responsibility reduction. *Id.*

Nor did the court err in imposing an enhancement for obstruction of justice. One way to obstruct justice is to commit perjury, U.S.S.G. § 3C1.1 & cmt. nn. 1 & 4(B), which the district court found Alexander did when he testified about how the drug deal was initiated. The court noted that Alexander's testimony was contradicted by Tran's testimony and by the August 5 phone call, which the court found both confirmed that Alexander first suggested the oxycodone deal and showed that, contrary to Alexander's claims at trial, he was familiar with oxycodone. Alexander argues this was error because Abney testified before the grand jury that, before the oxycodone deal was initiated, Tran told Alexander he could acquire illegal drugs from California. Regardless of Abney's grand jury testimony (and it may not have been contradictory, *see* footnote 1), the district court did not clearly err in relying on Tran's testimony and the recorded conversations. *See Smith*, 804 F.3d at 737–38. We defer to the district court's credibility determination.

Finally, denying Alexander's motion for a downward departure was not error. Alexander contends the district court should have granted such a departure because Tran offered oxycodone at a below market price and said Alexander needed to buy more tablets to get that price, thus inflating the drug quantity. We do not have jurisdiction to review the district court's conclusion that no downward departure was warranted based on application note 27(A) to section 2D1.1, which allows a downward departure if the government set a

15

price for the controlled substance substantially below market value, "leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed." U.S.S.G. § 2D1.1, app. n. 27(A).  This court has jurisdiction to review a refusal to grant a departure only if the refusal was based on a legal error; not if the refusal was based on a determination that the departure was not merited on the facts. *Brace,* 145 F.3d at 263.  The district court found that the government did not set the price substantially below market value, crediting the testimony of a DEA agent who testified that $12 per tablet was market value for a wholesale quantity of oxycodone tablets.  This fact-based decision is not subject to review.

We do have jurisdiction to consider whether the district court imposed a greater sentence than necessary because it did not consider the impact of sentencing entrapment.  *See United States v. Davis*, 575 F. App'x 361 (5th Cir. 2014).  The district court may depart downward from the Guidelines range based on mitigating circumstances "of a kind, or to a degree, not adequately taken into consideration by the . . . guidelines."  18 U.S.C. § 3553(b)(1); U.S.S.G. § 5K2.0; *see Brace,* 145 F.3d at 263.  This court has not decided if sentencing entrapment is a viable defense to a sentence.  *See United States v. Stephens*, 717 F.3d 440, 446–47 (5th Cir. 2013).  We need not do so here.  As we have explained, were we to accept the concept of sentencing entrapment, it would be cognizable only in cases involving "true entrapment," or "overbearing and outrageous conduct" by the government.  *Id.* (quoting *United States v. Tremelling*, 43 F.3d 148, 152 (5th Cir. 1995)).  For reasons we have already discussed in detailing the evidence supporting the jury's finding of no entrapment as to the offense itself, Alexander has not met that stringent standard.  *See id.*; *Davis*, 575 F. App'x at 361.

\* \* \*

The judgment is AFFIRMED.

16